766 So.2d 492 (2000)
Barrett PURVIS, Appellant,
v.
MARION COUNTY SCHOOL BOARD, Appellee.
No. 5D99-3600.
District Court of Appeal of Florida, Fifth District.
September 22, 2000.
Mark D. Shelnutt, of Mark D. Shelnutt, P.A., Ocala, for Appellant.
William C. Haldin, Jr., of William C. Haldin, Jr., P.A., Ocala, for Appellee.
GRIFFIN, J.
Barrett Purvis ["Purvis"] appeals a final order of the School Board of Marion County terminating his continuing contract of employment. Because we find that the decision was supported by competent substantial evidence, we affirm.
Purvis was hired by the School Board for the 1997-1998 school year as a high school physical education teacher and head basketball coach at Dunnellon High School. On May 10, 1998, he was arrested by officers of the Ocala Police Department subsequent to an altercation he had with his fiancee outside a local nightclub.[1] He was charged with domestic violence battery, resisting an officer with violence, and *493 battery on a law enforcement officer as a result of the incident.
Purvis was suspended on June 23, 1998. He requested a hearing, which by mutual consent was postponed until after resolution of the criminal charges against him.
On March 19, 1999, Purvis was tried before a jury on the reduced charges of resisting arrest without violence and battery on a law enforcement officer, and was acquitted. His version of events was that his fiancee had slapped him, and not vice versa, after which he had been wrongfully placed under arrest, was battered by police officers and sprayed with pepper spray.
Following Purvis' criminal trial, the Superintendent of Schools for Marion County amended the administrative charges against Purvis to add the further allegation that Purvis had lied at his criminal trial. The additional charge was that:
5. During his criminal trial on or about March 26, 1996, Respondent did knowingly and willfully, utter false statements while under oath with the intention of misleading the tribunal and concealing the truth.
At his subsequent administrative hearing, Purvis disputed all of the material allegations contained in the amended charging document.[2]
Purvis' administrative hearing took place on August 12, 1999. The issue as framed by the hearing officer was whether Purvis had engaged in "misconduct in office.[3]" The State Board of Education has defined this term as follows:
Misconduct in office is defined as a violation of the Code of Ethics of the Education Profession as adopted in Rule 6B-1.001, FAC., and the Principles of Education Profession in Florida as adopted in Rule 6B-1.006, FAC., which is so serious as to impair the individual's effectiveness in the school system.
Fla. Admin. Code R. 6B-4.009(3).
At the hearing, the parties stipulated to the admission of testimony from the criminal trial for substantive purposes. A number of live witnesses also appeared at the hearing, including a paramedic who testified that he had treated Purvis for pepper spray following the incident, two police officers who had participated in Purvis' arrest, and an eyewitness to the arrest. Purvis also testified on his own behalf at the hearing.
Two witnesses gave testimony relating to the issue of whether Purvis' actions were so serious as to impair his effectiveness in the school system. Mr. James ["James"], the principal of Dunnellon High School, testified that as principal he is responsible for supervising all personnel at the school. His prior evaluations of Purvis had both a teaching component and a coaching aspect. He explained:
I look at the effectiveness of the teacher as he present [sic] himself to the class, he present [sic] himself to the parent, and to the community. That's part of his assessment.
When we look as his coaching ability, we look at the person not only as a *494 coach but we look at him as a role model. We look at him as aas a counselor, and a person thatalmost a surrogate parent per se.
He testified that he could not recommend retaining any teacher who was not honest, trustworthy, and loyal. He said that a teacher also needs to be able to give students "the best possible advice" and to maintain the "highest standards." James explained that following Purvis' acquittal, he had originally wanted him to return to Dunnellon, but had changed his mind after reading the transcript. He said:
There were several things in [the trial transcript]. One, the incident and fact that we were there, that Barry was there.
Two, was the fact that I was reading his testimony, and I was reading that and I know in my mind that he knew that that was something that was not appropriate for us as Dunnellon High School. I know that he know that [sic].
He also said that his staff is extremely important because "if a principal is to impact the lives of students it's through staff." He testified that were he to rehire Purvis, he would have difficulty "backing him" because he has failed to demonstrate the high standards which James wants to maintain. He also testified that Purvis knew what was expected of him in terms of being a role model, and he had violated the trust that had been put in him by going to Shark Attack, while knowing he was not supposed to be there:
[T]his young man knew that I did not want him out there. And by looking at the transcript he knew what I expected of him in terms of being a counselor for these students, being someone they can go when they're in a tight situation.
Okay? When I read this transcript I felt that he had betrayed the trust that I had put in him because he knew between a shadow of a doubt that that was a no-no.
James acknowledged that the jury in the criminal trial had found Purvis not guilty of any offense, but said this was not material to his decision to retain Purvis. He stated:
[M]y jury is the people at Dunnellon High School. I have stood with Barry when I've had people that called and said he did this or that. So when we start talking about juries, let's make sure we get the right jury.
* * *
The jury that tried his case had no bearing on my recommendation to the superintendent. The jury that tried his case is the jury of young people that I have and the parents of those folks.
James acknowledged that he had been quoted in the newspaper on July 21, 1998 (two months after the incident) regarding Purvis, and that he had stated:
Barry is to be commended for the tremendous job that he has done. No matter what happens that is something you can't take away from anyone. He is an excellent coach and teacher.
He also admitted that prior to the incident, all of Purvis' assessments had been good and that he had recommended the renewal of his professional contract in February 1998.
Dr. Smith, the Superintendent of Schools for Marion County, testified that he had (a) read the criminal trial transcript; (b) considered information presented by his support staff; (c) considered James's recommendation to terminate Respondent's employment; (d) considered Joint Exhibit 2; (e) read newspaper articles relative to the May 10, 1998 incident; and (f) consulted with three members of the school advisory council of Dunnellon High School. He does not believe that Purvis should return to Marion County schools as a teacher or coach. Dr. Smith determined that Purvis should be terminated because of his questionable integrity. He explained that Purvis was not sufficiently trustworthy to be responsible for supervising, advising, and influencing students, *495 especially in situations beyond the classroom or where he is the only adult present, such as field trips, athletic events, and club activities. He noted that teaching requires something more than the "ability to deliver instruction." He explained:
The role of a teacher is much more than their ability to deliver instruction. And it is also based upon the fact that they, in their actions and behavior both in school and outside of school, influence children.
Annually we conduct an assessment of our graduating seniors to determine their experience in our schools. And second only to parents they indicate that teachers have a great role in influencing their decisions and their futures.
He ultimately concluded that Purvis "would not be effective as a teacher" at Dunnellon.
On October 4, 1999, the administrative law judge issued an order in which she recommended Purvis' reinstatement. In making this recommendation, she found the following facts regarding the incident and Purvis' subsequent testimony at his criminal trial: On the night of May 9, 1998, Purvis had gone to Shark Attack with his fiancee and her cousin, despite having been warned by his principal not to go to the club. `While at the club, Purvis became involved in an argument with his fiancee, Ms. Casko, because she refused to leave. Ms. Casko's cousin intervened in the argument when they took the argument outside, and Purvis grabbed him by the face, after which Ms. Casko began hitting Purvis. Purvis struck Ms. Casko during the altercation, but there was "no persuasive evidence" that the blow was intentional. The bouncer from the club saw the argument and asked the club's manager to call police. Four officers soon arrived in their patrol cars, and several went to retrieve Purvis, who had walked down the street, away from his fiancee. Although initially cooperative, Purvis became belligerent upon learning that he was going to jail for domestic violence, and officers had to hold Purvis against the hood of a patrol car in order to put the cuffs on him. Purvis also refused to get in Officer Compton's police car, as directed by officers, and instead attempted to give Ms. Casko back her ring. In the process of trying to give back the ring, he "accidentally butted Officer Sellers in the head, leaving him stunned." This prompted officers to spray Purvis with pepper spray, following which Purvis began to struggle "vigorously." Purvis was taken across the road to await medical treatment for the pepper spray; and an ambulance crew arrived and irrigated his eyes, after which Purvis was taken to jail. At his subsequent trial on reduced charges of resisting arrest without violence and battery on a law enforcement officer, Purvis testified that he received no medical attention whatsoever for his eyes before arriving at the jail. He also testified that it was a "preposterous lie" that a rescue squad had irrigated his eyes across the street from the club.
Based on these facts, the administrative law judge made the following findings regarding the charges made against Purvis:
46. In the instant case, Respondent was drinking alcohol in a public place that he had been advised not to patronize. However, he was not intoxicated.
47. Respondent conducted himself inappropriately when he grabbed Ms. Casko's cousin by the face. He then participated in an ensuing struggle, which resulted in his unintentional striking of Ms. Casko.
48. Respondent resisted the police officers when they were trying to handcuff him. He resisted them again as he struggled to communicate with Ms. Casko after the officers directed him to get in Officer Compton's patrol car. However, there is no persuasive evidence that Respondent deliberately butted Officer Compton in the head.
49. Respondent testified falsely in his criminal trial when he stated that he did *496 not receive medical treatment for injuries to his eyes for pepper spray. This false testimony undoubtedly served to impeach the credibility of the three police officers who testified at the criminal trial.
Although the administrative law judge concluded that Purvis had lied under oath at his criminal trial and had resisted arrest, she nonetheless concluded that neither offense was so serious as to impair his effectiveness as a teacher and therefore refused to dismiss him for "misconduct in office." In finding that Purvis' conduct had impaired his effectiveness as a teacher, the administrative law judge reasoned:
51. Mr. James' statements to the local newspaper about Respondent's outstanding performance as a coach and a teacher and Respondent's subsequent acquittal in his criminal trial substantially undermine any adverse publicity associated with Respondent's behavior on May 10, 1998. There is no evidence that Mr. James's recommendation to terminate Respondent was based on in-put from students, parents, or community members who believed that Respondent would no longer be effective as a teacher.
52. Dr. Smith concluded that Respondent would not be effective as a teacher in part due to his contact with three members of the school advisory council who affirmed his opinion. Petitioner did not present the testimony of those council members. More importantly, Petitioner did not present evidence distinguishing what the reaction of Dr. Smith, Mr. James, or the council members would have been absent evidence that Respondent testified falsely at his criminal trial.
53. The Office of the State Attorney prepared Joint Exhibit Two. There is no evidence that the State Attorney had charged Respondent with perjury or intended to do so. There is no evidence that Respondent's false testimony at his criminal trial was "common knowledge" prior to Petitioner's introduction of it in the instant case.
54. Respondent did not present any evidence regarding the impact of his behavior on the public's perspective of his ability to be effective as a teacher. Even so, the evidence presented by Petitioner is insufficient to warrant dismissal.
Contrary to the recommended order, the School Board concluded that, as a matter of law, Purvis' conduct was "so serious as to impair [his] effectiveness in the school system." The School Board explained:
47. Both Respondent's principal and his superintendent cited impairment of Respondent's integrity and trustworthiness as among the reasons for recommending that he not be reinstated as a teacher, in spite of his acquittal at his criminal trial. Impaired integrity and trustworthiness are reasonable inferences arising out of Respondent's false testimony at his criminal trial.
48. Respondent's principal and teacher also cited to the need for a teacher to be trustworthy when advising and influencing students and, especially, when the teacher is in situations beyond the classroom or where he is the only adult present, such as field trips, athletic events or club activities. It is both reasonable and appropriate that school administrators place significant weight on the integrity and trustworthiness of a teacher, generally, and particularly in such special settings, to determine the teacher's suitability for employment as a teacher. In this case, Respondent having been a head basketball coach even before his suspension, Respondent's supervisors are even more justified in considering integrity and trustworthiness as essential components of his qualifications.
49. Lack of integrity and trustworthiness on the part of a teacher, as reasonably perceived by his supervisors, necessarily impairs his effectiveness in the school system.
*497 Based on these conclusions, the School Board terminated Purvis' teaching contract.
The issue on appeal is whether the school board erred in terminating Purvis, because the evidence was insufficient to show that Purvis' effectiveness in the school system had been impaired. Purvis contends that he must be reinstated because the School Board failed to present any evidence that his conduct was so serious as to impair his effectiveness in the school system. He argues:
There was no testimony from School Board officials, district officials, Administrators at Dunnellon High School, parents, or anyone else regarding how the events that served as the basis for discipline affected Purvis' effectiveness. Such impaired effectiveness cannot be presumed or surmised, but must be provided by evidence. Without the evidentiary record, the School Board had no competent substantial evidence to make a finding of fact that Purvis' effectiveness was seriously impaired, as it did in paragraph forty-nine of the Final Order.
The success of Purvis' argument on sufficiency of the evidence appears to depend on what the requirement that Purvis' conduct must be "so serious as to impair his effectiveness in the school system" means. Two decisions of other courts suggest that this is always a factual issue, on which evidence must be presented and a factual finding made. See McNeill v. Pinellas County School Board, 678 So.2d 476 (Fla. 2d DCA 1996); MacMillan v. Nassau County School Board, 629 So.2d 226 (Fla. 1st DCA 1993).
In McNeill, which involved a charge of immorality, rather than misconduct in office, a teacher had been suspended following his arrest for criminal battery when he allegedly touched an undercover law enforcement officer in a sexually suggestive manner. The School Board ultimately terminated the teacher for immoral conduct. The Second District reversed the order of termination on the basis that the School Board failed to meet its burden of proof with respect to impaired effectiveness. The court noted that, contrary to supporting a finding of impaired effectiveness, there was evidence that the teacher's arrest would have no impact on his effectiveness. The court explained:
While Pollock concluded that McNeill's conduct "reasonably fall[s] within the definition of immorality," he also noted a lack of evidence in support of impaired effectiveness. Rather than hostility and condemnation from community members, Pollock noted an "outpouring of affection and support ... from past and present students, their parents, [McNeill's] coworkers, friends and associates... who lauded his performance as a parent, citizen and teacher." Twenty-five students, parents, friends, coworkers, and former supervisors testified in support of McNeill. Another twenty-five citizens submitted letters on his behalf, all expressing their belief that he can continue to effectively perform his duties.
As for evidence in support of McNeill's dismissal, Pollock noted that testimony offered by school officials to establish impaired effectiveness was unsupported by "specific information from students, parents, or coworkers...." Two citizens testified as to why McNeill should be dismissed; however, both were unable to provide specific information regarding the actual impact of McNeill's conduct on Pinellas County students.
Ultimately, Pollock found the School Board's evidence insufficient to prove that McNeill's actions had any significant impact on the school or the school's reputation. Moreover, Pollock's emphasis on support from McNeill's students, colleagues and community is consistent with a finding of unimpaired effectiveness.
Id. at 478.
In MacMillan, a teacher was charged with misconduct in office after he allegedly *498 made inappropriate, lewd or sexually oriented remarks to at least eight female students. The hearing officer found that the comments to the female students did not constitute misconduct in office, but the School Board disagreed and terminated MacMillan. On appeal, the First District found the hearing officer's decision was supported by substantial competent evidence and observed that: "[o]ther than the Superintendent's conclusory remarks, we find no evidence demonstrating a loss of effectiveness in the school system." Id. at 229-230.
This court, however, has indicated that impaired effectiveness in the school system can be inferred from certain misconduct. Summers v. School Board, 666 So.2d 175 (Fla. 5th DCA 1995). The Summers opinion does not specify the particular misconduct involved, but does say there had been no finding that a teacher's conduct was "so serious as to impair the individual's effectiveness in the school system" nor was any evidence on this issue presented at the teacher's hearingthat is, no one testified that appellant's conduct impaired his effectiveness. Summers argued that these two omissions required reversal of the order of suspension. This court disagreed, holding that the teacher's impaired effectiveness could be inferred from the nature of the violation.
In Walker v. Highlands County School Board, 752 So.2d 127 (Fla. 2d DCA 2000), the court found that no evidence of impaired effectiveness was necessary because the misconduct "spoke for itself." The Walker court was careful to distinguish its earlier decision, McNeill, because that case involved conduct of a "private immoral nature."
It may be that the rule's "impaired effectiveness" language was intended to be a descriptive term that refers to the degree of seriousness of the misconduct which would warrant dismissal, not a requirement that the School Board conduct surveys to determine how citizens view the conduct. This view is supported by the difficulty of proving that a teacher's effectiveness has been impaired. If, as the MacMillan court found, the testimony of the superintendent as the teacher's supervisor and an experienced educator is merely "conclusory," the alternative of parading the competing opinions of students, parents and co-workers would appear to be even less enlightening.
Even if "impaired effectiveness" is an issue for proof rather than a standard of severity, we do not think the issue of proof of "impaired effectiveness" turns on whether the misconduct occurred on school grounds. Some classroom conduct might not "speak for itself" just as some off-campus conduct might. Here, Purvis lied under oath and resisted arrest. This is a level of misconduct which would support the inference that Purvis' effectiveness as a teacher has been impaired, even though no parent, student or co-worker was called as a witness to say so. The fact that Purvis was willing to lie under oath is particularly damaging to Purvis' effectiveness as a teacher and coach, since it harms his credibility in his dealings with others. The hearing officer's reliance on his teaching and coaching skills and the lack of public scandal are irrelevant to the trust issues articulated by the School Board.
Because we do not consider, at least in this case, that the decision whether the particular misconduct at issue is so "serious as to impair an individual's effectiveness in the school system" requires testimony of actual impairment from students or parents, we affirm. The School Board is entitled to reject or modify conclusions of law reached by the administrative law judge. See § 120.57(1)(j), Fla. Stat. (1997)("The agency in its final order may reject or modify the conclusions of law and interpretation of administrative rules over which it has substantive jurisdiction."); Goss v. District School Board, 601 So.2d 1232 (Fla. 5th DCA 1992). Furthermore, "an agency's interpretation of its own regulations has traditionally been *499 accorded considerable respect." Beach v. Great Western Bank, 692 So.2d 146, 149 (Fla.1997). Although this deference is not absolute, the courts should defer to the agency unless their construction amounts to an unreasonable interpretation, or is clearly erroneous. Legal Envtl. Assistance Foundation, Inc. v. Board of County Comm'rs of Brevard County, 642 So.2d 1081, 1083-84 (Fla.1994).
AFFIRMED.
HARRIS and PETERSON, JJ., concur.
NOTES
[1] The nightclub has been variously referred to as Party Central, the Painted Horse Saloon, the Coach and Paddock, and Shark Attack.
[2] During oral argument, the author of this opinion asked counsel for Purvis several questions, making it apparent that the judge had misapprehended the terms of the pre-trial stipulation filed below, erroneously believing that counsel for Purvis had stipulated that perjury had occurred. Immediately following oral argument, the judge discovered the error. As discussed during oral argument, given the hearing officer's findings, this misunderstanding had no effect on the outcome of the issues on appeal; however, the court recognizes that this was an unnecessary negative distraction for appellant's counsel for which he was not responsible and apologizes to counsel.
[3] Whether "misconduct in office" is the only basis on which Purvis could be terminated is not an issue in this case; however, we note that the statute speaks of "just cause:"

Just cause includes, but is not limited to, misconduct in office, incompetency, gross insubordination, willful neglect of duty, or conviction of a crime involving moral turpitude.
§ 231.36(1)(a) Fla. Stat.