PER CURIAM.
 

 Cydney Abrams [“Abrams”] appeals a final order of the Seminole County School Board that terminated her employment as a teacher. We conclude that the Seminole County School Board’s [“School Board”] decision improperly disregarded the recommended order of the Administrative Hearing Officer assigned to hear the case. Accordingly, we reverse.
 

 Abrams was employed by the School Board as a special education teacher at Winter Springs High School. On March
 
 *286
 
 11, 2009, Abrams engaged in what she acknowledges was a prolonged, unprofessional, and inappropriate verbal exchange with one of her students, J.P., during her third period math class. Another student recorded twenty-six minutes of this exchange on her MP3 recorder.
 

 The recording captures an almost frenzied shouting match between teacher and student. J.P. is highly agitated and engages in a rapid-fire argument with Abrams over a range of topics, during the course of which Abrams makes innumerable statements or comments that do not appear to be appropriate for a classroom teacher. At times, Abrams’s conduct appears to be calculated to reason with J.P., or to distract her, but other times, it seems to degenerate into a game of one-upmanship with the child that drives the child deeper into a frenzy. Even if the avalanche of words could be captured in an accurate transcript, listening to the audio is the only way this event can be appreciated. When J.P. complains that Abrams does not help her; Abrams tells J.P. she “must be crazy,” after which a sustained shouting match ensues between student and teacher as to which of them is crazy and who called whom bad names. When Abrams told J.P. that she will not do her work for her because she will have to do her own work in life, J.P. retorted that she will have a better life than Abrams, prompting Abrams to reply, “Child, that’s a joke” that she could look at J.P. and tell what her life was going to be.
 

 J.P. repeatedly asked to leave the class, but Abrams would not allow it. J.P. said that Abrams “always talks a bunch of crap” and called Abrams an idiot. Abrams responded in kind. J.P. told her: “You don’t know shit.” Abrams responded: “And J.P. don’t have to know shit. I done told you curse words don’t bother me, baby.” J.P. asked Abrams: “What the fuck are you gonna do?” Abrams responded: “I don’t have to do a fucking thing, J.P. What the fuck are you gonna do? Are you just gonna use profanity and think that’s gonna shock me?”
 

 As the two continued to argue, Abrams asked J.P. what caused her to “pop off’ on her when she simply told her to stop talking to another student. J.P. accused Abrams of being a poor teacher; “You was one of my favorite teachers, now you don’t do nothing.” The two then argued about Abrams’s handling of another student, B. Abrams again asked J.P. what was going on with her; it was the first time in three years that she had seen her like this. Abrams asked if she had been smoking or drinking, which J.P. referred to as a “stupid” question. Then, in another extended portion, Abrams repeatedly told J.P. to go to the administration and to ask to be removed from her class because she (Abrams) was a “lousy idiot of a teacher.” When Abrams responded that she does “a damn good job” as a teacher, J.P. said that all the students only like Abrams because she takes them on field trips and gives them food. Abrams told J.P. that she does not have to worry about that because she will not be going on any more field trips. Abrams then called another teacher and told her that because J.P. had been cursing at her and had been so disrespectful and verbally abusive, J.P. will no longer be able to go on field' trips. The withdrawal of this privilege appears to have made J.P. even more distraught and led to an argument between Abrams and J.P. over what curse words had been used and by whom. Finally — mercifully—the bell rings and the class ends.
 

 As a result of this incident, Abrams was suspended, first with pay and later without pay. After an investigation was conducted, the Superintendent of Schools petitioned the School Board to terminate
 
 *287
 
 Abrams’s employment for just cause on the grounds that her actions constituted conduct unbecoming a School Board employee and misconduct in office. Abrams requested a due process hearing.
 

 The hearing was held on November 30 and December 1, 2009, before Administrative Law Judge, R. Bruce McKibben [“ALJ”]. The School Board presented the testimony of four witnesses: John Reic-hert [“Reichert”], the Executive Director of Human Resources for the School Board; Michael Blasewitz [“Blasewitz”], the principal of Winter Springs High School; P.M., the father of a student in Abrams’s class, and Abrams. Over Abrams’s objection, the recording of the exchange was admitted into evidence. Abrams presented the testimony of ten witnesses: Dr. Joseph Trim [“Trim”], a mental health counselor; Cornelius Pratt [“Pratt”], the former assistant principal at Winter Springs High School; Jimmie Blake [“Blake”] and Margo Rolle [“Rolle”], special education teachers; Joyce Smith [“Smith”], a paraprofessional; T.L., L.R-B, M.M., and D.B., the parents of students taught by Abrams; and Abrams.
 

 Reichert testified that he recommended to the Superintendent that Abrams be immediately suspended and her employment terminated. This recommendation was based on the degree of misconduct in this incident combined with two letters that were already in Abrams’s personnel file. One letter addressed Abrams’s inappropriate unprofessional communication with another staff member. Another letter dealt with Abrams’s inappropriate communication and profanity with students.
 

 Reichert opined that the intention of and duration of Abrams’s conduct could not be a mere lapse of judgment: he characterized it as embarrassing to the student and disparaging to the student and her family, a violation of student confidentiality and the school’s civility policy. Reichert said it was “one of the worst cases of misconduct that five seen in my time in education.” “This was an ongoing, intentional, willful act, in my opinion, that the teacher was trying to exasperate, irritate, and really degrade the student in the presence of other students.”
 

 On cross-examination, Reichert admitted that Abrams’s evaluations from 2004 to 2008 were satisfactory. Reichert also admitted that he has no special expertise with exceptional student education and did not meet with J.P. or her mother.
 

 Abrams had Reichert identify the disciplinary files of five other Seminole County teachers and one employee for the use of profanity, violation of the civility policy, or violation of the Code of Ethics or Principles of Professional Conduct, and these exhibits were admitted into evidence on behalf of Abrams. Of the six, only three involved students or the classroom. In the first case, a student was giving a female teacher a hard time in letting her pass down the stairs, and a male teacher told the student “to get the F out of the way.” There were no prior issues with this teacher. He was reprimanded, recommended for a two-day suspension, and notified that subsequent use of profanity could result in termination of employment. In the second case, a teacher became upset during a staffing meeting regarding her son and walked off campus indicating that she was “sick of this place.” She did not have permission to leave the campus and left her students unattended. She was technically “AWOL” for the remainder of the day. The issue did not involve profanity. She was suspended for three days. The third case involved a female teacher who made inappropriate comments, including some profanity, in the classroom. A two-day suspension without pay was recommended.
 

 
 *288
 
 Blasewitz testified that he supported the Superintendent’s recommendation to terminate Abrams’s employment “because of the prolonged and continuous argument that took place in her classroom that resulted in disparaging remarks, profanity, unprofessional behavior over a good period of time.” Word about the incident leaked out on campus, and a number of teachers expressed concern, disappointment and dismay about what they had heard. Bla-sewitz contacted the parents of the students in Abrams’ class, and they expressed anger, outrage, and shock about the incident. J.P. was immediately moved to another class, and at least two students asked to be moved because they were afraid of Abrams. In his opinion, Abrams’s conduct impaired her effectiveness as a teacher: “In my twenty plus years of being a principal, it’s one of the most unprofessional exhibits I’ve ever been exposed to.” On cross-examination, Blasewitz admitted that he could not speak to what might happen if Abrams were transferred to a different school. Blasew-itz also admitted that the two students who sought to be removed from Abrams’s class were among those who had recorded the incident and were worried about retribution from Abrams if they remained in her classroom.
 

 P.M. testified that he listened to the tape and said that Abrams “had dug her own grave.” Instead of arguing with the student, Abrams should have called security and had her removed from the class. P.M. thought that Abrams deserved another chance, but should not teach special education students. P.M. had never met Abrams, and his son has not had any problems with Abrams.
 

 Abrams testified that she has a Bachelor of Science degree from the University of Florida and a Florida Department of Education Professional Teaching Certificate. Abrams is certified to teach kindergarten through twelfth grade for Exceptional Student Education [“ESE”] and Emotionally Handicapped students. Abrams began teaching in 1992, and started teaching at Winter Springs High School in July 2002.
 

 Abrams taught J.P. twice a day, in her social studies class and in her third period math class, which was classified for the educable mentally disabled [“EMD”]. During the exchange with J.P., Abrams was handing out papers and assisting or distributing information to the four remaining students in the class. Abrams was unaware that a student was recording the dispute.
 

 Normally, as an ESE teacher, Abrams would ask a student who was upset to sit down, be quiet, and begin work. If the student did not comply, Abrams would have the student removed from the class. In hindsight, Abrams admitted that she should have done this with J.P., but J.P. “being the type of student she was with me, I did not send her out.” J.P. did not appear to be a threat and “the relationship that I had with her did not merit [removal].”
 
 [1]
 

 Abrams said she and J.P. had a wonderful rapport, a wonderful relationship. Abrams was like a mother to her and she would often discuss personal issues with Abrams. In her first period class, J.P. had confided in Abrams that her family was possibly going to leave Florida and that she did not want to go.
 

 By the third period math class, J.P. was a different student. As J.P. entered the
 
 *289
 
 class, one of her good Mends was being sent out with a referral to the Dean’s Office. Abrams believes that the referral aggravated J.P. J.P. came to class upset and Abrams told her “shake it off” and get to work. J.P. started talking to another student and Abrams told her to move to the front of the classroom. “And one thing led to another....”
 

 Abrams had been told that J.P. was a disciplinary problem; she was feisty but “when she would get kind of off track, I could pull her back in.” Abrams was not surprised at the words that J.P. was using; J.P. curses and uses profanity. J.P. can be very emotional and Abrams used to tease her that “she’s my little drama queen.” Abrams was surprised that J.P. said the things she did about hating her because “I was her mom first period, third period, I hate you, you never meant us any good, so I was very surprised.”
 

 Abrams admitted that her conduct was extremely unprofessional and agreed it supported suspension, but not termination: “I don’t think those twenty-six and-a-half minutes can encapsulate the nineteen years of professional services I’ve done with education.”
 

 Abrams explained that the 2004 reprimand involved an emotionally handicapped student who was placed in a classroom with EMD students. The student used profanity on several occasions and Abrams decided “to make an instructional lesson about what words were and were not appropriate to be used in the classroom. As a result I was called into the dean’s office and a written reprimand was provided.” The words that the student was using (hell, damn, and ass) were part of the lesson that they were not supposed to be used in a classroom and were not uttered in anger.
 

 Dr. Trim was accepted as an expert in mental health counseling and evaluating and counseling teachers with workplace issues. Dr. Trim met with Abrams and reviewed a transcript of the incident. Dr. Trim did not listen to the recording but assumed that it was very intense, angry, abrasive, and unprofessional. Dr. Trim was of the opinion that there was a low risk of Abrams repeating the behavior in the short term because the event had been significantly traumatic for her. In the long term, Abrams would benefit from anger management training and counseling. Abrams had accepted responsibility, expressed her remorse and willingness to go to counseling; therefore, Dr. Trim opined that Abrams would not have a further occurrence.
 

 Pratt testified that his primary responsibilities included supervision of the ESE Department; he was Abrams’s immediate supervisor. Abrams did a great job of teaching and was very concerned about the students. Pratt often sent teachers who were having trouble in the ESE Department to Abrams for advice. Pratt used Abrams as a “lead” teacher to help new or struggling teachers. On a scale of one to ten, Pratt would give Abrams’ classroom management a nine. Most of her students had behavior problems as well as learning problems. Abrams very seldom wrote a referral on a student and tried to handle problems within the classroom. Abrams always received very good evaluations.
 

 Pratt is familiar with J.P., who, like many ESE students, struggled academically, which sometimes showed in her emotional behavior. J.P. wanted to change classes quite often, and she has been challenging to other teachers in terms of wanting to have her own way. “She would become disrespectful, which is not unusual for some students who struggle with her disability. When they’re academically challenged, there are sometimes [sic] when they’re not going to be taken out of a class
 
 *290
 
 immediately they will act out knowing that eventually that would constitute a change.”
 

 Pratt believed that teaching special education students was a “gift” because of the challenge and the need for nurturing the students. Abrams nurtured her students and the students, even J.P., playfully referred to her as “mother.” After the incident, J.P. came to him and asked what was going to happen to Abrams; J.P. told Pratt that she did not want Abrams to lose her job.
 

 When the information about the incident initially came to Pratt, he contacted the principal, Blasewitz. When Blasewitz listened to the recording, his comment was “we got her now.” Even though Pratt customarily makes recommendations for discipline of teachers, Pratt was not asked to do so in this case.
 

 Pratt expressed the view that Abrams’s behavior was inappropriate and warranted disciplinary action, but not termination. “I find it very hard to deal with because other people on the campus use such language and — you know, I mean, you have to terminate a whole lot of people if you’re gonna do that, starting with your coaching staff, the entire coaching staff.” Severe profanity happens at all sporting events. Pratt has often witnessed coaches chastise students using profanity, and they were not reprimanded; the excuse always given is that it is the “culture” of coaching.
 

 Blake testified that he has known Abrams since 2004. Blake was sent by an administrator to observe Abrams during his internship because they liked her teaching styles and methods. Abrams helped Blake when he came to Winter Springs High School as a new teacher, and she was his mentor. Abrams was like a mother figure to the students; she was very caring and concerned about them. Abrams would pay the fees for field trips and buy food for the students with her own money. Blake did not believe that Abrams had lost her effectiveness as a teacher and that the incident was not characteristic of what he observed in her classroom over the years.
 

 Rolle testified that she knew Abrams from middle school where they both taught. In her opinion, Abrams was an “awesome” teacher. The students loved her and called her “mom” and “auntie.” Rolle heard the recording of the incident, but still respects Abrams as a colleague and believes that she can be an effective teacher.
 

 Smith testified that she had been Abrams’s instructional assistant until 2008. At that time, Smith was told that the School Board no longer had the funding for an EMD assistant. Abrams was a very good teacher and actually taught the students; some of the other teachers would just show movies most of the day. Smith never saw Abrams act in a harsh or demeaning manner.
 

 T.L., who is also a teacher, testified that Abrams taught his autistic son for three years. T.L. had a very favorable impression of Abrams; she cared about his son’s needs. T.L. retained confidence in Abrams’s ability.
 

 L.R-B., also an educator, testified that Abrams taught her autistic son for three years. Abrams was an advocate for her son and was able to get him to do what was needed to be successful; as a result, her son was on the Honor Roll. L.R-B’s son loves Abrams and was very disappointed when she was removed from the classroom. L.R-B believes that “enough buttons were pushed where she at that moment got lost in that” and would “absolutely” put Abrams back in the classroom.
 

 M.M. testified that Abrams taught her educable mentally disabled son for three years. M.M. was very impressed with
 
 *291
 
 Abrams, who was a very caring teacher. M.M. still has confidence that Abrams can be an effective teacher.
 

 D.B. testified that Abrams taught her son in the EMD program for four years. She and her son had a good experience with Abrams. D.B. opined that Abrams “could have just had a bad day. The girl might have had pushed her buttons.”
 

 The ALJ concluded that the School Board proved that Abrams’s behavior was inappropriate and a violation of the standard of conduct expected of teachers. To determine whether Abrams’s behavior constituted “just cause” for termination of employment,
 
 [2]
 
 the ALJ looked to section 1012.83(l)(a), Florida Statutes, for the definition of “just cause,” which includes “misconduct in office.” “Misconduct in office” is defined under the Florida Administrative Code as a violation of the Code of Ethics and Principles of Professional Conduct for the Education Profession that is “so serious as to impair the individual’s effectiveness in the school system.” The ALJ concluded that the School Board did not prove that Abrams’s effectiveness in the school system had been impaired. The incident, while egregious, was not indicative of Abrams’ normal demeanor and Abrams has shown remorse and willingness to prevent further outbursts. The ALJ recommended that the School Board find that Abrams’ behavior was inappropriate, uphold her suspension without pay to date, reinstate her as a teacher, and place her on probation for two years.
 

 Both sides filed exceptions to the recommended order. The School Board rejected two paragraphs of the recommended order as not being supported by the evidence, and made additional findings of fact. The School Board rejected paragraph sixteen, in which the ALJ found that the argument between J.P. and Abrams carried an underlying hint of the long and friendly relationship between the parties, and paragraph twenty-six, in which the ALJ found that Reichert’s recommendation that Abrams’ employment be terminated lacked weight because he was unfamiliar with other salient facts. The School Board added paragraphs twenty-seven through thirty-one, finding that Blasewitz had been contacted by teachers who expressed concern, dismay, and disappointment about the incident, that some parents of students in the class expressed anger, outrage, and shock regarding Abrams’ conduct, that J.P. was transferred to another class, that two other students requested transfers, and that Blasewitz believed that Abrams’ behavior constituted one of the most severe exhibitions of unprofessional conduct that he had encountered and had undermined her effectiveness as an educator.
 

 The School Board also substituted several of its own conclusions of law. One of these was a conclusion that “conduct unbecoming a School Board employee” was a basis for termination separate and apart from misconduct in office, that it was supported by the record, and that the School Board proved that Abrams’ effectiveness in the school system had been impaired. The School Board also concluded that Abrams’ conduct was far more serious than conduct by other teachers who had only been suspended. The School Board finally determined that the ALJ’s findings of fact as supplemented by the School
 
 *292
 
 Board established a basis to terminate Abrams’ employment.
 

 Section 120.57(1)(£), Florida Statutes (2009), provides that an agency in its final order may reject or modify the conclusions of law over which it has substantive jurisdiction and the interpretation of administrative rules over which it has substantive jurisdiction, but when rejecting or modifying a conclusion of law, the agency must state with particularity its reasons for rejecting or modifying the conclusion and must make a finding that its substituted conclusion is as or more reasonable than that which was rejected or modified. Moreover, the agency may not reject or modify findings of fact unless the agency first determines from a review of the entire record, and states with particularity in the order, that the findings of fact were not based upon competent substantial evidence or that the proceedings on which the findings were based did not comply with the essential requirements of law.
 

 The termination of School Board employees is governed by section 1012.33, Florida Statutes, and Rule 6B-4.009 of the Florida Administrative Code.
 
 Blackwood v. Div. of Admin. Hearings,
 
 2 So.3d 386, 387 (Fla. 4th DCA 2009). Section 1012.33, Florida Statutes (2008), provided in part:
 

 § 1012.33. Contracts with instructional staff, supervisors, and school principals
 

 (l)(a) Each person employed as a member of the instructional staff in any district school system shall be properly certified pursuant to s. 1012.56 or s. 1012.57 or employed pursuant to s. 1012.39 and shall be entitled to and shall receive a written contract as specified in this section. All such contracts, except continuing contracts as specified in subsection (4), shall contain provisions for dismissal during the term of the contract only for just cause. Just cause includes, but is not limited to, the following instances, as defined by rule of the State Board of Education: immorality, misconduct in office, incompetency, gross insubordination, willful neglect of duty, or being convicted or found guilty of, or entering a plea of guilty to, regardless of adjudication of guilt, any crime involving moral turpitude.
 

 [[Image here]]
 

 (4)(e) Any member of the district administrative or supervisory staff and any member of the instructional staff, including any school principal, who is under continuing contract may be suspended or dismissed at any time during the school year; however, the charges against him or her must be based on immorality,
 
 misconduct in office,
 
 incompetency, gross insubordination, willful neglect of duty, drunkenness, or being convicted or found guilty of, or entering a plea of guilty to, regardless of adjudication of guilt, any crime involving moral turpitude, as these terms are defined by rule of the State Board of Education.
 

 [[Image here]]
 

 (6)(a) Any member of the instructional staff, excluding an employee specified in subsection (4), may be suspended or dismissed at any time during the term of the contract for just cause as provided in paragraph (l)(a).
 

 (Emphasis added). Rule 6B-4.009 provides in part:
 

 6B-4.009. Criteria for Suspension and Dismissal.
 

 The basis for charges upon which dismissal action against instructional personnel may be pursued are set forth in Section 231.36, F.S. [now section 1012.33]. The basis for each of such charges is hereby defined:
 

 [[Image here]]
 

 
 *293
 
 (3) Misconduct in office is defined as a
 
 violation
 
 of the Code of Ethics of the Education Profession as adopted in Rule 6B-1.001, F.A.C., and the Principles of Professional Conduct for the Education Profession in Florida as adopted in Rule 6B-1.006, F.A.C.,
 
 which is so serious as to impair the individual’s effectiveness in the school system.
 

 (Emphasis added). In the “Conclusions of Law” portion of the recommended order, the AL J stated:
 

 35. The School Board did not prove, by a preponderance of the evidence, that [Abrams’] effectiveness in the school system had been impaired by her actions. The incident, while egregious in its own right, does not seem indicative of [Abrams’] normal demeanor. Despite having engaged in the admittedly wrong behavior, [Abrams] has shown the requisite remorse and willingness to prevent any further outbursts.
 

 The School Board substituted the following conclusion for the ALJ’s conclusion:
 

 The School Board proved, by a preponderance of the evidence, that [Abrams’] effectiveness in the school system has been impaired by her actions.
 

 Abrams contends on appeal that the ALJ’s “conclusion” was in reality a finding of fact and the School Board erred by substituting its own finding. Abrams points out that the fact/law label used by the agency is not determinative.
 
 See, e.g., Pillsbury v. State, Dep’t of Health & Rehabilitative Servs.,
 
 744 So.2d 1040, 1041-42 (Fla. 2d DCA 1999). She relies on several cases in which the courts refer to the issue of a teacher’s impaired effectiveness as an issue of fact.
 
 McNeill v. Pinellas Cnty. Sch. Bd.,
 
 678 So.2d 476, 477 (Fla. 2d DCA 1996) (“We reverse because there is substantial competent evidence in the record to support the hearing officer’s findings that McNeill’s conduct did not impair his effectiveness in the community or the school system.”);
 
 McKinney v. Castor,
 
 667 So.2d 387, 389 (Fla. 1st DCA 1995) (“In the present case, there was a dearth of record evidence to support a finding that McKinney’s conduct ... was ‘sufficiently notorious’ to bring McKinney and the education profession ‘into public disgrace or disrespect and impair [McKinney’s] service in the community,’ or that McKinney’s conduct seriously reduced his effectiveness as an employee of the school board.”);
 
 Braddock v. Sch. Bd. of Nassau Cnty.,
 
 455 So.2d 394, 395 (Fla. 1st DCA 1984) (“The issue with which we are here concerned is whether there is in the record competent substantial evidence to support the Board’s finding that Braddock’s conduct and behavior were of such character as to result in a diminution of his effectiveness as a teacher. We conclude that there is not.”).
 
 [3]
 

 Abrams acknowledges that this Court in
 
 Purvis v. Marion County School Board,
 
 766 So.2d 492 (Fla. 5th DCA 2000), established that impaired effectiveness may be decided as a matter of law in cases where impaired effectiveness is inherent in the nature of the misconduct. At the heart of the School Board’s position in this appeal is its view that Abrams’s misconduct was of such a nature and extent that the statutory test is met as a matter of law. Abrams’s position is that her misconduct, when examined in the context of her overall job performance and considered in light of all the facts, did not, as a matter of law, establish a loss of effectiveness as a teacher. Abrams points out that the School
 
 *294
 
 Board’s conclusion of impaired effectiveness required the School Board to create new findings and conclusions not found by the ALJ.
 
 Packer v. Orange Cnty. Sch. Bd.,
 
 881 So.2d 1204, 1207 (Fla. 5th DCA 2004) (if there is competent substantial evidence to support the ALJ’s findings of fact, the agency may not reject them, substitute its findings, or make new findings). Finally, Abrams urges that three of the new findings were supported only by hearsay.
 
 Forehand v. Sch. Bd. of Gulf Cnty.,
 
 600 So.2d 1187 (Fla. 1st DCA 1992).
 

 The School Board rests its position on
 
 Purvis
 
 and
 
 Walker v. Highlands County School Board,
 
 752 So.2d 127 (Fla. 2d DCA 2000), which held that the teacher’s loss of effectiveness in the school system in that case was “patent and obvious.” The School Board urges that the misconduct in this case was more serious and even more egregious than the misconduct in
 
 Purvis
 
 and
 
 Walker
 
 because Abrams repeatedly and intentionally publicly humiliated and embarrassed J.P. during almost an entire class period and ignored the other students.
 

 We apply well-established principles here: while an administrative agency may reject conclusions of law without limitation, neither an agency nor a reviewing court may reject an administrative hearing officer’s findings of fact, as long as those findings are supported by competent substantial evidence in the record.
 
 Maynard v. Fla. Unemployment Appeals Comm’n,
 
 609 So.2d 143, 145 (Fla. 4th DCA 1992). If there is competent substantial evidence in the record to support the ALJ’s findings of fact, the agency may not reject them, modify them, substitute its findings, or make new findings.
 
 Rogers v. Dep’t of Health,
 
 920 So.2d 27, 30 (Fla. 1st DCA 2005). Nor may the agency reject a finding that is substantially one of fact simply by treating it as a legal conclusion.
 
 Maynard,
 
 609 So.2d at 145.
 

 In this case, the School Board improperly rejected paragraph sixteen, in which the ALJ found that the tone of the argument, though heated, carried an underlying hint of the long and friendly relationship between Abrams and J.P. The School Board also improperly rejected paragraph twenty-six in which the ALJ found that Reichert’s recommendation, while reasonable based on his experience, lacks weight due to his unfamiliarity with other salient facts. These findings were supported by the evidence.
 

 Nor was the School Board free to add new findings of fact.
 
 Fla. Power & Light Co. v. State,
 
 693 So.2d 1025, 1026-27 (Fla. 1st DCA 1997). The School Board expressly based termination of Abrams’ employment on the “findings of fact made by the ALJ
 
 as supplemented by the School Board.”
 
 (Emphasis added).
 

 In
 
 Resnick v. Flagler County School Board,
 
 46 So.3d 1110 (Fla. 5th DCA 2010), this court reversed an order terminating the employment of a school nurse where the Flagler County School Board had taken an approach similar to the school board. In that case, the ALJ found only two instances of minor misconduct and recommended that the school board discipline the nurse by imposing a written reprimand and requiring him to undergo a medical evaluation. The school board substantially changed the ALJ’s findings of fact, conclusions of law, and recommended penalty, with the result being the termination of employment. This Court concluded that the school board had erred in so doing:
 

 In a fact-driven case such as this, where an employee’s conduct is at issue, great weight is given to the findings of the administrative law judge, who has the opportunity to hear the witnesses’ testimony and evaluate their credibility. An administrative agency such as the School Board may not modify an admin
 
 *295
 
 istrative law judge’s factual findings “unless the agency first determines from a review of the entire record, and states with particularity in the order, that the findings of fact were not based upon competent substantial evidence.” § 120.57(1)(Z), Fla. Stat. (2007). If the administrative law judge’s findings are supported by competent substantial evidence, the agency cannot reject them even to make alternate findings that are also supported by competent substantial evidence. An agency abuses its discretion when it improperly rejects an administrative law judge’s findings. We conclude the School Board abused its discretion in this case when it modified the factual findings in the recommended order. The administrative law judge’s findings were supported by competent substantial evidence. The School Board improperly substituted certain of its own findings to support the desired result of termination. When “the reasons for the change are legally insufficient, it is entirely appropriate to remand with instructions to approve the hearing officer’s recommendations.”
 
 Dep’t of Prof'l Regulation v. Bernal,
 
 531 So.2d 967 (Fla.1988). Accordingly, we reverse and remand with directions to the School Board to adopt the administrative law judge’s recommended order.
 

 46 So.3d at 1112-13. (Citations omitted).
 

 The facts and circumstances involved in the various cases addressing the question of misconduct serious enough to impair a teacher’s effectiveness are so varied that attempting to compare them side-by-side and weigh the nuances is unsatisfactory and unfair to both the teacher and the School Board. As the cases suggest, the question of the seriousness of the misconduct in relation to impairment of a given teacher’s effectiveness is most often a question of fact. The issue of impaired effectiveness can be decided as a matter of law in an appropriate case, but should be decided on a individualized basis. It is a close question whether the conduct in this case meets the
 
 Purvis/Walker
 
 threshold, but we conclude it does not. Abrams’s misconduct must be considered in the context of the classroom event and in the context of the teacher’s overall career and standing. We cannot say, as a matter of law, that Abrams’ misconduct satisfies the test for dismissal. The hearing officer considered all the facts, and found that it did not. Accordingly, we reverse and remand to the School Board to enter a final order consistent with the recommended order of the Administrative hearing officer.
 
 [4]
 

 REVERSED and REMANDED.
 

 PALMER and LAWSON, JJ., concur.
 

 GRIFFIN, J., dissents, without opinion.
 

 [1]
 

 . Abrams's classroom has a telephone and she could have called for assistance, but she did not have an assistant in her class, so Abrams could not have stepped outside with J.P.
 

 [2]
 

 . The collective bargaining agreement between the Seminole Education Association and the School Board provides that:
 

 F. Any dismissal or disciplinary action for continuing contract teachers or professional service contract teachers shall be for just cause in compliance with Florida Statutes and the Florida School Code.
 

 [3]
 

 . Abrams also points out that some courts have referred to the ALJ’s determination on loss of effectiveness as a "conclusion” but argues that the courts nonetheless treat the conclusion as one of fact rather than law, citing
 
 MacMillan v. Nassau County School Board, 629
 
 So.2d 226, 227 (Fla. 1st DCA 1993).
 

 [4]
 

 . The School Board seeks affirmance under the alternative ground that its addition of a conclusion in the final order that just cause existed for Abrams’ dismissal based on "conduct unbecoming” a teacher would support the dismissal decision. The contention lacks support, and we conclude it has no merit.